Per Curiam :
Plaintiff sues to recover the costs he incurred in returning himself, his family, and his household furnishings to the United States from a foreign-duty post. The costs followed plaintiff’s voluntary resignation from his position to accept a position in private employment.
The facts and pertinent parts of the regulations are set out in detail in the findings of fact submitted by the trial commissioner, which findings we have approved and make the findings of the court.
Briefly, the issue arises in this way. In 1943, plaintiff was employed by the OfB.ce of Education, Federal Security Agency, and served in several capacities; for the most part in Washington, D.C., although his duties occasionally entailed travel to points outside the United States.
On June 24, 1952, plaintiff became separated from the Federal Security Agency in order to transfer to the Department of State. He accepted a position in the Division of Foreign Service Personnel under an indefinite appointment to serve as Program Officer in Baghdad, Iraq. The minimum duration of a tour of duty was, in the absence of special agreement at the time of assignment, 2 years from the date of the employee’s arrival at the post.
Plaintiff’s initial tour of duty in the Baghdad post expired on July 30,1954, although he might have remained at that post for an additional tour or tours of duty.
However, prior to the expiration of his initial tour of duty in Baghdad, plaintiff concluded that he did not wish to remain at this post beyond the minimum expiration date of this tour. He was especially dissatisfied with the educational facilities available for his sons, and, primarily in the interests of his sons’ education, wanted to return to the United States. He indicated his desire for a suitable position with *235 the staff of the Foreign Operations Administration in Washington, D.C.
About the middle of May 1954, the Foreign Operations Administration in Washington authorized the Baghdad Mission to issue travel orders to the plaintiff in accordance with his request. Such orders were issued July 21,1954, for plaintiff’s “transfer” to Washington, D.C. These orders authorized the transportation for plaintiff and his three dependents, as well as the shipment of plaintiff’s automobile and the family’s household effects. However, plaintiff sold his automobile locally, and arranged for passage for himself and family, and caused his household furnishings to be packed and made ready for shipment. On July 28, 1954, 2 days before plaintiff was scheduled to depart, the Foreign Operations Administration cabled plaintiff an offer of an assignment in Beirut.
Although plaintiff was interested, the offer came too close to his scheduled departure date, all arrangements having been made by then for return to the United States, including the relinquishment of the lease of the house he had occupied. Plaintiff at the time was uncertain whether the educational facilities in Beirut for his sons would, be satisfactory. Plaintiff and his family left Baghdad on July 31, 1954, as originally scheduled. His household furnishings were shipped at defendant’s expense to Washington, D.C.
Upon his return to Washington, plaintiff was given a temporary assignment as a consultant on the Iraq program and budget. During this period, plaintiff, still persisting in his desire for relocation to Washington, discussed with various officials of the Foreign Operations Administration the possibility of being appointed to the Washington staff of that agency. However, at that time there was no suitable position within the agency in plaintiff’s field of specialization. Plaintiff then accepted the assignment to Beirut.
Plaintiff stated that he desired to ship his automobile and household effects to Beirut at defendant’s expense. This presented a problem to the agency. Ordinarily, in transferring a foreign service officer from one post to another, defendant simply paid the transportation from the old to the new assignment. The agency officials finally concluded, how *236 ever, under what was considered to be the proper interpretation of the applicable statutes and regulations, that since the effects had now been shipped from the Baghdad assignment to Washington, D.C., they could not now be shipped from Washington to the second post if plaintiff’s service was considered as a continuing one. They felt that a foreign service employee was entitled to have only one shipment of his household effects at Government expense from Washington, D.C., to an overseas post and return; and that the return shipment takes place at the termination of service as a foreign service employee. Transportation had already been furnished for such shipment to and back from Baghdad, and the agency was being asked to make another shipment to Beirut, and then back from Beirut again upon the completion of the second tour.
The Director of Personnel concluded that the only possible way to accomplish what the regional operations officers desired was to have plaintiff separated from the agency and thus terminate his status as a foreign service employee. Immediately thereafter the plaintiff was to receive a new appointment and assignment to the Beirut post. The forms, however, included the words “without break in service” and “continuous service.” This was done for such purposes as annual leave, sick leave, and retirement benefits. This would enable annual leave to be transferred.
There was no understanding between plaintiff and any agency official that these phrases on the form were intended to mean anything else. At the time of plaintiff’s assignment to the Beirut post, it was his intention to remain there for the full 2 years, and the agency officials expected him to. serve at least for such period of time.
In the absence of special agreement at the time of assignment, the minimum duration of a tour of duty was 2 years from the date of the employee’s arrival at the post.
On February 17,1956, about 9 months prior to the scheduled completion date of plaintiff’s 2-year tour of duty in Beirut, he was offered a non-Government position in Washington, D.C. He delayed accepting the offer for a short time in an effort to ascertain whether the defendant could be induced to pay the expenses of his return prior to the expira *237 tion of a minimum normal tour of duty. In the meantime, he was offered a position with the agency in Washington. This he declined since he desired to resume his university teaching, in which line of work he had been engaged prior to his entering Government service. Plaintiff returned to Washington with his family and his effects, the transportation costs of which he personally paid. He sought reimbursement for the expenses thus incurred. Upon his return to Washington, he was employed by the National Education Association.
We here quote from finding 15 the following, which we think disposes of the issue involved in this case:
Since it was generally understood that the service of such a full 2-year foreign tour of duty was a prerequisite to the return of the employee, his family, and household effects at defendant’s expense, an appointment with the right reserved in the employee to serve less than 2 years and still have such transportation expenses defrayed by defendant would, in accordance with standard administrative practice, have such right specifically reflected in the appointment papers. Similarly, foreign service appointments for service for definite periods of time of less than 2 years would also have such limited duty tours specifically set forth in the appointment papers in order to make plain that the employee would be entitled to have such transportation expenses to and from the foreign post defrayed by defendant despite the limited tour. Such appointments are possible and are sometimes made, but, as stated, upon explicit understanding with respect thereto and specific provision therefor in the appointment papers.
In plaintiff’s case, there was no such understanding nor did his Beirut appointment papers make any such provision therefor.
In view of the facts as disclosed by the record, we find plaintiff is not entitled to recover and the petition is dismissed.
BINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Saul Bichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a citizen of the United States and a former employee of the International Cooperation Administration, *238 sues to recover tbe costs he incurred in returning himself, his family and his household furnishings to the United States from a foreign duty post. As will appear, these costs followed plaintiff’s voluntary resignation from the agency to accept a position in private employment.
2. In 1943, plaintiff was employed by the Office of Education, Federal Security Agency, and served as Director of the English Language Training Program in Haiti. He also subsequently served in such Office as Specialist in Inter-American Educational Eolations until 1950, when he became Assistant Director of the Office’s Division of International Educational Eolations. He remained in this position until June 24, 1952. Although plaintiff’s duties in the Office of Education occasionally entailed travel to points outside the United States, he was stationed in Washington, D.C., at all times while with that agency.
Prior to entering the Federal service, plaintiff, who holds a doctorate, was an Assistant Professor of English at the University of Maryland.
3. Effective as of the close of business on June 24, 1952, plaintiff became separated from the Office of Education, Federal Security Agency, in order to transfer to the Department of State. Effective June 25, 1952, plaintiff became employed by the Division of Foreign Service Personnel, Department of State, under an “Indefinite Appointment,” to serve as “Program Officer” in Baghdad, Iraq. These personnel actions (described on the personnel records of the Federal Security Agency as a “Separation-Transfer”) were effected with a reservation to plaintiff of rights to reemployment with the Federal Security Agency.
Plaintiff’s duties with the Department of State were related to certain foreign assistance activities and programs (the so-called “Point IV” program) then being administered by the Technical Cooperation Administration, an entity within the Department of State.
Plaintiff was assigned to the headquarters of the United States Operations Mission in Baghdad, Iraq, to which he reported on or about July 31, 1952, for the commencement of his tour of duty at that post. The expense of transporting plaintiff, his wife, their two sons, an automobile, and *239 their household effects (approximately 16,000 pounds) was borne by the Department of State.
4. On June 1,1953, while plaintiff was serving in the Baghdad post, the Technical Cooperation Administration was, by Executive Order 10458, dated June 1, 1953 (18 Fed. Beg. 3159), transferred from the Department of State to the jurisdiction of the Director for Mutual Security (appointed under the Mutual Security Act of 1951, as amended). On August 1, 1953, plaintiff was again transferred to a newly established independent agency, the Foreign Operations Administration. This agency was established by Reorganization Plan 7, effective August 1, 1953, which transferred to it the functions of the Office of Director of Mutual Security, the Mutual Security Agency, the Technical Cooperation Administration, the Institute of Inter-American Affairs, and several other foreign assistance activities. Plaintiff was aware at the respective times that he, along with other former Technical Cooperation Administration employees of the Department of State, had been transferred from such Department and were instead now ultimately employed by the Foreign Operations Administration, an independent agency.
5. (a) At all times pertinent herein, the agencies in which plaintiff served, and which were authorized by statute to appoint special (or uncommissioned) foreign service personnel on indefinite tenure, customarily assigned such personnel to designated overseas posts for “tours of duty.” The minimum duration of a tour of duty was, in the absence of special agreement at the time of assignment, 2 years from the date of the employee’s arrival at the post. A tour of duty was concluded by the employee’s return to the United States within a reasonable time after completion of 2 years’ service abroad. If the return was for “home leave” a new tour commenced upon his return to a foreign post from such leave.
(b) Plaintiff’s initial tour of duty in the Baghdad post was scheduled to and did expire (so far as its minimum duration and his eligibility to return to the United States were concerned) on July 30, 1954. While plaintiff’s initial tour of duty abroad concluded on that date, the completion of *240 the tour did not, however, necessarily terminate plaintiff’s service at the post. His appointment was of indefinite duration, and he might have remained at that post for one or more additional 2-year tours of duty (assuming that his continuance in the post was satisfactory and agreeable both to plaintiff and the agency). Similarly, the completion of the initial tour of duty did not necessarily involve a termination of plaintiff’s service abroad with the agency, which simply required either his continuance in the Baghdad post or his transfer to another available foreign duty post for an additional tour of duty.
■6. Prior to the expiration of his initial tour of duty in Baghdad, plaintiff concluded that he did not desire to remain at this post beyond the minimum expiration date of the tour. He was particularly dissatisfied with the educational facilities available for his sons, and, primarily in the interests of his sons’ education, wanted to return to the United States. On or about May 1,1954, he so advised the persons in charge of the Baghdad Mission, and further indicated his desire for a suitable position with the staff of the Foreign Operations Administration in Washington, D.C. Plaintiff felt that, upon his return, if no such job was available, he would be in a position to seek employment with some other Government agency in Washington and could, in any event, return to the agency in which he held reemployment rights (i.e., the Department of Health, Education, and Welfare, which, by Reorganization Plan 1 of 1953, had been established on April 11, 1953, and to which was transferred the functions and units of the former Federal Security Agency).
As a result, on May 1, 1954, which was approximately 3 months prior to the expiration of plaintiff’s tour of duty, the Director of the Baghdad Mission sent the following air-gram to the Foreign Operations Administration in Washington :
The tour of duty of Dr. Paul E. Smith, IRAQ,-T-6, Program Officer, expires July 30, 1954. Dr. Smith desires to transfer to duty in Washington upon completion of this tour of duty.
It is requested that the Post be authorized to issue Travel Orders authorizing travel of Dr. Smith and three *241 dependents from Baghdad to Washington, D.C., including three days consultation for Dr. Smith.
Dr. Smith plans to leave Baghdad on July 30, 1954, travel via air to Europe, sail from Southampton, arriving in Washington approximately September 1,1954. Approximately 3 weeks annual leave will be taken en route.
It will be appreciated if the authority to issue TOs can be granted promptly in order to facilitate travel arrangements for Dr. Smith and his family.
7. By cablegram of May 18,1954, the Foreign Operations Administration in Washington authorized the Baghdad Mission to issue the requested travel orders to plaintiff. On July 21,1954, such orders for plaintiff’s “transfer” to Washington, D.C., were issued. The orders authorized such transportation for plaintiff and his three dependents, as well as the shipment of plaintiff’s automobile and the family’s household effects (up to 16,000 pounds). Plaintiff and his family were at that time making preparations to depart from Baghdad. Plaintiff sold his automobile locally. However, he caused his household furnishings to be packed, removed, and made ready for shipment, and arranged passage for himself and his family.
8. On July 28, 1954, 2 days before plaintiff was scheduled to depart, the following cablegram was dispatched by the Foreign Operations Administration in Washington and received by the Baghdad Mission:
Subject necessary clearances would Paul Smith consider immediate transfer two-year assignment Beirut Begional Training Officer, FSS-1, liaison AUB [American University in Beirut] and area missions implementing regional training programs? Would necessitate deferring home leave until approximately November.
9. Although the offer interested him, since he himself had recommended the creation of a Begional Training Officer’s post in Beirut, Lebanon, the cablegram nevertheless failed to change plaintiff’s plans to return to Washington. The offer came too close to his scheduled departure date, all arrangements for returning to the United States having been made, including the relinquishment of the lease of the house he had occupied. Plaintiff was uncertain whether the educational facilities in Beirut for his sons would be satisfac *242 tory and there generally was insufficient time to ascertain all the details concerning the nature of the new position tendered. He felt that if the post was still available when he returned to the United States, he could then obtain further information about these matters. Accordingly, without rrralring any attempt to determine whether his household furnishings (which had been removed from his former residence approximately 2 weeks before the cablegram arrived) had actually left Baghdad, plaintiff promptly advised the Baghdad Mission officials of his decision to go through with his plans to return to the United States. On July 29,1954 there was dispatched from the Mission the following cablegram to the Foreign Operations Administration in Washington:
Regional training officer post interests Smith but plans for departure Iraq have progressed too far for immediate transfer. If post not (repeat not) filled upon Smith’s return, he would be pleased discuss it.
Plaintiff and his family departed from Baghdad on July 31, 1954, as originally scheduled. His household furnishings were shipped at defendant’s expense to Washington, D.C., arriving there approximately September 22, 1954.
10. While serving at foreign duty posts, employees of the Foreign Operations Administration accrued, in addition to regular annual leave, credits for “home leave” which they were eligible to take immediately upon (or as soon as administratively practicable after) the completion of each minimum 2-year tour of duty before return to the same, or transfer to, a new foreign duty post. The purpose of home leave for foreign service employees is to reacclimate and reorient the employee periodically to the American environment and culture during the continuance of overseas duty. Home leave does not affect the continuity of the employee’s service as a foreign service employee. It is granted only when it is intended by both the agency and the employee that the employee will be reassigned to another tour of duty overseas after such leave.
For travel to the United States on home leave, foreign service personnel of the Foreign Operations Administration were entitled to transport at the agency’s expense certain *243 specified amounts of accompanied and unaccompanied baggage. Household furnishings, however, either remained at the foreign post to which the employee was expected to return or were shipped to the new foreign post of assignment to which he was to report after the conclusion of the home leave.
Plaintiff did not return to Washington, D.C., on such “home leave.” Before leaving Baghdad, plaintiff made no request that he be placed on home leave status, nor were any arrangements made to hold plaintiff’s household goods in Baghdad or to ship or redirect them to Beirut or any other overseas post. Instead, his household furnishings were shipped to Washington.
11. Plaintiff arrived in Washington on September 1,1954, and shortly thereafter reported to the Foreign Operations Administration where he was assigned to duty as consultant on the Iraq program and budget. As shown (findings 6, 7), plaintiff had originally been authorized 3 days of consultation in Washington. However, on September 8, the Administration in Washington directed the Baghdad Mission to amend the travel orders it had previously issued to reflect authorization of “fifteen days consultation FOA/W [Foreign Operations Administration in Washington] without per diem.” This procedure was necessary because during the consultation period plaintiff’s salary was being paid from funds allocated to the Iraq Mission and his status as a foreign service employee continued. At the expiration of the period of consultation plaintiff was, at his request, carried on annual leave status while in Washington, his salary during this period also being paid from funds allotted to the Iraq Mission.
12. During his consultation period in Washington, plaintiff, persisting in his desire for relocation to Washington, discussed with various officials of the Foreign Operations Administration the possibility of his being appointed to the Washington staff of the agency in some suitable position. This would have required the termination of his status as a foreign service employee and his appointment and resumption of his status as a regular civil service employee in accordance with the grades and salaries applicable to such *244 employees. At that time, however, there was no suitable position available within the agency in Washington in plaintiff’s field of specialization, and, although plaintiff was highly regarded by the agency, it did not find it possible to offer him a position at the location he then preferred.
13. (a) A number of officials with operational or program responsibility in the Foreign Operations Administration, who had a high regard for plaintiff’s qualifications' and past performance, considered him to be particularly suitable for the Beirut, Lebanon, post which had previously been offered to plaintiff on the eve of his departure from Baghdad. These officials, desiring to retain plaintiff’s services for the agency, discussed the position with him in some detail and urged him to accept it. Eventually, after having satisfied himself that there was no suitable position for him with the agency in Washington, and having resolved to some extent his misgivings concerning the quality of the educational facilities for his two sons in Beirut, plaintiff indicated his agreement to accept the post in Beirut, as it had a number of features which were attractive and challenging to him.
(b) However, before definitely committing himself to accept the Beirut post, plaintiff stated that he desired to have sent to Beirut, at defendant’s expense, his own automobile in addition to his household effects. This request presented an administrative problem to the agency. The return of plaintiff’s household furnishings, together with another automobile, to Beirut at defendant’s expense involved a situation in which the shipment of those items would of necessity originate in Washington, to which plaintiff had not actually been permanently transferred and where he was not officially stationed. Although a Government car was available to Mission employees in Beirut, plaintiff, considering such arrangement to be unsatisfactory, insisted on having his own car available for his family’s use at all times. At the same time, however, plaintiff indicated that he had no desire to reship as large a quantity of household effects as he had taken with him to Baghdad, since he did not wish to subject his furniture to the damage which had occurred in the prior transit. Furthermore, suitable furnished quarters were available for rent in Beirut.
*245 14. After giving further consideration to the problem of how to ship plaintiff’s automobile and household effects from Washington to Beirut at the agency’s expense, and upon the urging of the officials in charge of the Near East and Africa regional operations (“O/NEA”) under the Director of Operations, who were fearful that unless some method be found to accommodate plaintiff’s requests plaintiff might not accept the position, the Office of the Director of Personnel finally arrived at what it considered to be a solution. This Office, which had jurisdiction over the matter, concluded that, under what it considered to 'be the proper interpretation of the applicable statutes and regulations, the Foreign Operations Administration could not, if plaintiff’s status as a foreign service employee continued without change, defray the expense of reshipping plaintiff’s automobile and household effects from Washington to Beirut. It reasoned that plaintiff would be assuming a second tour of duty, that plaintiff was still a foreign service employee assigned to the first tour of duty’s office (the Baghdad Mission) and that, as it construed the regulations, a foreign service employee transferring from one tour of duty at one post to a second at another post was entitled only to have his effects shipped from the first post to the second. Here, however, the effects had already been shipped back to Washington, and the Office concluded that they could not now be shipped back from Washington to the second post, if plaintiff’s service be considered as a continuing one and as a transfer from Baghdad to Beirut. The Office felt that a foreign service employee was entitled to have only one shipment of his household effects at Government expense from Washington to an overseas post and return (not counting transferring the effects from one foreign post to another), and that the return shipment takes place at the termination of his service as a foreign service employee. Here, however, the agency had already paid for such shipment to and back from Baghdad, and was being asked to make another such shipment to Beirut, and then back from Beirut again upon the completion of the second tour.
Accordingly, the Director of Personnel concluded that the only possible way to accomplish what the regional operations *246 officers desired was to have plaintiff separated from the agency. This would serve to terminate plaintiff’s status as a foreign service employee. Then, immediately thereafter, plaintiff would receive a new appointment and assignment to the Beirut post. As such a new employee, the Baghdad appointment and tour of duty would be nullified and the Beirut tour of duty could then be counted as plaintiff’s first tour, with plaintiff becoming eligible, as any new employee would be, to have his effects shipped to the foreign post and then shipped back to Washington upon the completion of the Beirut tour of duty or of his further service thereafter as a foreign service employee.
The Office of Personnel felt that this solution was consistent with what had actually taken place, since it considered plaintiff’s return from Baghdad in effect to have been a return for termination purposes anyway. At the time of his return, plaintiff had no post for a second foreign tour, and he was not returning on home leave (with his effects remaining at the foreign post) to await assignment for such a second tour. He was, instead, returning because he wished to relocate himself in Washington and, in connection therewith, to explore the possibility of a position with the Washington staff of the Foreign Operations Administration. However, had such a position been available, it too would have required plaintiff’s resignation as a foreign service employee and a new appointment as a regular civil service employee. Similarly, a transfer to some other agency, or the exercise of his reemployment rights with the Department of Health, Education, and Welfare, would also have necessitated his resignation as a foreign service employee. However, whether plaintiff’s return from Baghdad was for transfer to a position in Washington or for complete separation from the Foreign Operations Administration, he was entitled to transport himself, his family and household effects (as he did) at defendant’s expense.
15. (a) Plaintiff was advised of the proposed solution of the problem and was satisfied therewith. Accordingly, on October 22, 1954, the Foreign Operations Administration separated plaintiff from his position as Program Officer with the Mission at Baghdad. It did so by issuing to plaintiff *247 on that date a “Notification of Personnel Action” which effected such “Separation” as of the close of business on October 23,1954. Under “Remarks,” the form stated “Appointed USOM/Beirut, Lebanon [United States Operations Mission at Beirut] 10/24/54 without break in service.”
On the same day, October 22, 1954, the Administration issued to plaintiff another such “Notification of Personnel Action” effecting an “Indefinite Appointment,” effective October 24, 1954, as “Regional Training Officer” with the Mission at Beirut. This form also contained the notation “Con’t. Ser.” thereon, meaning “Continuous Service.” [1]
(b) The references in the above forms to “without break in service” and “continuous service” were to indicate the continuity of plaintiff’s employment as a Federal Government employee for such purposes as annual leave, sick leave, and retirement benefits. For instance, the continuation of his Federal service without a break by his separation at the close of business on one day and his appointment the very nest day made unnecessary the payment of a lump sum for any accrued annual leave as of the date of his separation. Where a simultaneous resignation and appointment occur, annual leave is simply transferred. This is what happened in plaintiff’s case. There was no understanding between plaintiff and any agency official that these phrases on such forms were intended to mean anything else. There was, in fact, no discussion at all by plaintiff with any agency official at the time the forms were issued about this particular matter.
(c) Similarly, there was no discussion between plaintiff and any agency official concerning the situation that would arise in the event plaintiff did not remain at his Beirut post for the customary 2-year tour of duty. At the time of plaintiff’s appointment to this post, it was his intention to remain there for the full 2 years, and the agency officials similarly expected him to serve at such post at least for such period of time.
Since it was generally understood that the service of such a full 2-year foreign tour of duty was a prerequisite to the *248 return of the employee, bis family, and household effects at defendant’s expense, an appointment with the right reserved in the employee to serve less than 2 years and still have such transportation expenses defrayed by defendant would, in accordance with standard administrative practice, have such right specifically reflected in the appointment papers. Similarly, foreign service appointments for service for definite periods of time of less than 2 years would also have such limited duty tours specifically set forth in the appointment papers in order to make plain that the employee would be entitled to have such transportation expenses to and from the foreign post defrayed by defendant despite the limited tour. Such appointments are possible and are sometimes made, but, as stated, upon explicit understanding with respect thereto and specific provision therefor in the appointment papers.
In plaintiff’s case, there was no such understanding nor did his Beirut appointment papers make any such provision therefor. Plaintiff’s problem was a different one, as explained above, and was solved to plaintiff’s satisfaction in the manner set forth.
Had plaintiff at the time of his second appointment specifically raised the problem of what the situation would be concerning his return transportation expenses if he failed to serve the full 2-year tour of duty, and had he made such a right of reimbursement a condition to his accepting the post, it cannot now be determined whether the agency would have consented to defraying such expenses. However, it would have had the power, had it so desired, of appointing plaintiff with such an understanding and agreement.
16. On October 26,1954, the Foreign Operations Administration in Washington directed the Mission in Baghdad by cablegram as follows:
Amend TO [Travel Orders] Paul Smith to show separation. New appointment, without break, Beirut, 10/24/54. * * *
Consequently, on November 1,1954, the Mission in Baghdad issued to plaintiff an amendment to the July 21,1954, travel orders (finding 7), the amendment being as follows:
*249 Separation — Baghdad, Iraq, to Washington, D.C.
17. Plaintiff departed for Beirut the month following his separation and reappointment. He arrived in Beirut on November 24,1954, where he was later joined by his family. Plaintiff shipped to Beirut at defendant’s expense a new automobile and certain household effects, which did not include many items of furniture which he had taken to and had returned from Baghdad. However, the record does not indicate that defendant imposed any limitation (i.e., less than the full amount permitted by the regulations) upon the amount of household effects plaintiff could take to Beirut.
18. At the time plaintiff departed for Beirut in November 1954, there was in effect within the Foreign Operations Administration, to plaintiff’s knowledge, a publication known as the “FOA Manual.” It was generally similar in its scope and provisions to the “Foreign Service Manual” published by the Department of State. The issuance by the Foreign Operations Administration of its own manual relating to official travel and related transportation of effects had been preceded on November 20,1958, by “USFOTO CIRCULAR A-8,” which advised as follows:
It is planned to issue new manual orders consolidating rules and regulations now found in the MSA, TCA, and IIAA Manuals. However, in view of the many recent revisions of the Foreign Service Travel Regulations, the new restrictions imposed by the Mutual Security Appropriation Act of 1954, the centralization of the administrative functions of all activities of TCA, and the recent delegations of travel authorities it is advisable to give you an interim statement of administrative policy for Travel, Transportation, md Storage of Effects.
All authorizations in connection with official travel properly charged to FOA funds shall be governed by the Foreign Service Travel Regulations printed in Volume 1 FSM III 180, and the Standardized Government Travel Regulations published by the Bureau of the Budget and contained in Volume 1 FSM III 190, except for specific exemptions or restrictions as outlined below.
The portions of 1 FSM III 100 through 173 are not considered regulations, but rather are statements of policy regarding regulations issued under 180 FSTR and 190 FSTR. Therefore, they are not always applicable nor are they binding upon FOA authorizing officers. *250 It is suggested, however, that they be used for reference and to assist you in administratively applying the procedures.
*****
Plaintiff was aware of and had read the provisions of the foregoing circular on or about the date of its issuance. At that time, plaintiff was in Baghdad.
19. At all times during the period from the date of plaintiff’s acceptance of and departure for the Beirut post and his later resignation and return, the Foreign Service Travel [Regulations of the Department of State contained the following provisions:
2.1 Written Authorization or Approval
All travel, transportation, and related expenses performed or incurred under these regulations shall be authorized or approved in writing prior to payment or reimbursement from Government funds.
2.2 Authority of Department of State
2.21 General Authority
All travel performed in accordance with these regulations shall be authorized or approved by the Department of State except when authority to authorize or approve specific types of travel has been delegated.
*****
3. Allowable Expenses
3.1 ■ Authorizations for Non-Temporary United States Citizen Employees
In the absence of any specific limitation or extension stated in the travel authorization, the following enumerated expenses shall be allowable for travel or transportation performed under each indicated type of travel authorization issued to United States citizen employees other than temporary or part-time employees:
* * % Hi ❖
g. Resignation, Retirement, and Separation
When an employee is issued a travel authorization in connection with his resignation, retirement, or other separation from the Service, travel and per diem for employee from last post of assignment to designated place of residence in the continental United States or to place of residence abroad des *251 ignated by the employee, travel and per diem for family from last place to which family traveled at Government expense to employee’s designated place of residence, and shipment of effects from any post to which employee has been assigned and from any place where effects have been stored at Government expense to designated place of residence, provided that if the employee elects to reside abroad, allowable expenses shall be limited to expenses, including usual per diem allowances, actually incurred, or the constructive cost to last place of residence in the continental United States prior to appointment to the Service, or, if employee never resided in the continental United States, constructive cost to the nearest port of entry into the continental United States, whichever is least. * * * * *
3.73 Transfer for Convenience of Employee
Pursuant to the provisions of section 1, Public Law 600, 79th Congress, as amended (5 U.S.C. 736-1), no travel expenses shall be allowed or paid from Government funds under these regulations where the transfer is made primarily for the convenience or benefit of the employee or at his request.
3.8 Effect of Changes in Regulations
Any expenses incurred under travel authorizations issued in accordance with these regulations shall be allowed in accordance with the governing regulations as amended and in effect at the time the expenses are actually incurred.
20. Foreign Operations Administration Manual Order No. 455.1 entitled “Transportation of Foreign Service Employees, Dependents, and Effects” dated February 16,1954, which was in effect until after plaintiff’s arrival in Beirut, provided in pertinent part:
I. Authorization and Restrictions on Transportation of Employees in the Foreign Service of FOA
A. Authorisation
An employee is entitled only to such transportation as is specifically stated in the authorization of official travel, signed by an authorized official.

*252
B.Restrictions

Conditions existing at some posts make it necessary to establish certain restrictions relating to travel of dependents to the post, amount and kind of household effects which may be shipped, and shipment of automobiles. Where such restrictions have been prescribed, the employee’s entitlement to Government-paid transportation is subject thereto.
II. Transportation Authorized for Employee on Indefinite Appointment
Foreign service personnel occupying regular full-time positions for an indefinite term may be authorized transportation for dependents, effects, and automobile between the points indicated below, depending upon purpose of travel.
A. Appointment
From place or places of residence at time of appointment to post of assignment.
B. Home Leave
An employee is eligible for travel at Government expense for the purpose of taking leave in the United States as soon after completion of two years continuous service abroad as is considered administratively feasible. Transportation may be provided from post of assignment to place of residence in the United States or to any other destination provided cost does not exceed the cost of direct transportation from the post to the place of residence in the United States.
C. Transfer
From old post to new post.
D. Separation
1. To be eligible for transportation at Government expense at the time of separation an employee must:
a. Complete two years’ continuous Federal service at a foreign post, of which the last last six months were with FOA.
b. Complete one year’s continuous Federal service at a foreign post after home leave, of which at least the last six months were with FOA.
*253 c. Receive official orders to enter tbe military service. (This does not include calls to report for pre-induction or pre-enlistment examinations.)
d. Complete the prescribed term of service as stated in the conditions of employment.
e. Be separated for the convenience of the Government under one of the following circumstances:
1. Disqualification during the probationary period.
2. Abolishment of position or termination of need for the individual’s services.
3. Unsatisfactory performance.
f. Be separated due to:
1. Serious illness of the employee or a dependent for which adequate medical treatment is not available at the post or within the area.
2. Illness or death in employee’s family (not at post) which imposes upon the employee the care of a patient or maintenance of a home for minor children or aged kin.
3. Inability of dependents to adjust to overseas living with consequent danger of disrupting the family group.
‡ ‡ ‡ $
HI. Transportation Authorized for Employee on Temporary Appointment
Foreign service personnel appointed for short periods of service, not to exceed one year at the post, are entitled to transportation privileges only in the following instances:
A. Appointment at the Post
An individual with highly specialized skills and training needed at the post, who, by virtue of previous employment in the locality by another Federal agency or private organization, is available for short term employment, but who as a result of such employment would lose return transportation privileges with his former employer, may be granted the same return transportation privileges that he would have received from his former employer, within the limitations applicable to regular FOA employees being *254 separated from the service. The transportation to be authorized in such cases must be noted on the appointment journal as one of the conditions of employment. This privilege is not available to temporary secretarial, clerical or other administrative employees.
B. Appointment m the United States
1. Less them One Tear at the Post
An individual appointed for less than one year at the post may be authorized transportation only for self and baggage.
2. One Tear at the Post
An individual appointed for one year or more at the post, but for less than two years, may be granted transportation privileges of employees on indefinite appointments for self, dependents, and automobile, and for household effects consisting of electrical and gas household equipment and appliances, bedding, linens, china, silverware, and baby equipment, but not to exceed 35% of the allowable maximum. However, the post assignment and type of services to be performed will affect the extent to which it is desirable to grant these privileges. This will be determined prior to or at the time of appointment and the transportation privileges granted will be made a condition of employment and noted on the appointment journal.
21. (a) On July 1,1955, while plaintiff was in Beirut, the Foreign Operations Administration was, by Executive Order 10610, dated May 9,1955 (20 Fed. Beg. 3179), abolished, with the International Cooperation Administration (“ICA”) succeeding to its functions and authority. On November 16, 1955, ICA issued, as a part of its manual, a comprehensive Manual Order No. 560.2 entitled “Travel, Transportation and Storage of Effects — Foreign Service Employees.” This order, which was in effect when plaintiff later submitted his resignation and returned from Beirut, provided in pertinent part as follows:
4. Separation
a. Points Between which Tramel may he Authorized From the post of assignment to place of residence or to any other destination, provided the cost does *255 not exceed the cost of direct travel and other allowable expenses from the post to the place of residence. If the employee elects to reside abroad, allowable expenses will be limited to expenses, including usual per diem allowances, actually incurred, but in no event may the expense exceed constructive cost to the last place of residence in the continental United States, or, if the employee never resided in the continental United States, the constructive cost to the nearest port-of-entry into the continental United States, whichever is least,
b. Eligibility for Travel at Government Expense To be eligible for travel at Government expense at the time of separation an employee must:
$ $ $ $ ‡
(2) Complete the prescribed term of service as stated in the conditions of employment, or complete five years of continuous service in the Foreign Service.
(b) The following provisions of the Standardized Government Travel Regulations were in effect during the same period:
These regulations are issued for the guidance of civilian officers and employees of the departments and establishments as defined in the Travel Expense Act of 1949. Departments and establishments shall make requisitions upon the Federal Supply Service for such supply of these regulations as may be necessary to meet their requirements.
•i» »í»
5. Form of authority. — Except as otherwise provided by law all travel shall be either authorized or approved by the head of the agency or by an official to whom such authority has been properly delegated. The administrative approval of the voucher will constitute the approvals required in paragraphs 12a, 39, 45, 45c, 45d, 47, 75,76,78 and 79.
a. It is expected that ordinarily the authority will be issued prior to the incurrence of the expenses and will specify the travel to be performed as definitely as possible unless circumstances in a particular case prevents such action.
V «í« H*
22. On February 17, 1956, approximately 9 months prior to the scheduled completion date of plaintiff’s tour of duty *256 in Beirut, he was offered a non-Government position in Washington, D.C. (with the National Education Association). He did not immediately accept the offer, preferring first to determine, among other things, whether he would be eligible for return to Washington from Beirut at defendant’s expense.
23. Plaintiff, still primarily in the interests of his sons’ education, was eager to return to the United States, and so made known to the ICA officials. These officials desired, if possible, to retain plaintiff in the agency. By letter of March 8, 1956, plaintiff was tendered a position with the agency in Washington and urged to accept it on the grounds, among others, that “the question of bringing you home in the near future could be made to disappear.” However, the position tendered did not have a salary rating equal to that which plaintiff was receiving in his foreign post. Furthermore, plaintiff wanted to resume university teaching and felt (as stated in a letter of March 15,1956, to the agency) that the position with the National Education Association would better serve to effect his “transition from Government service to university life.” He therefore declined the offer.
24. On March 20, 1956, the Beirut Mission Director officially requested authority from ICA in Washington to issue “separation travel orders” for plaintiff’s return to the United States. No answer was immediately forthcoming, and the request was renewed on March 28 and April 2,1956. On April 8,1956, ICA in Washington dispatched the following telegram to the Beirut Mission:
Paul Smith not eligible travel, transportation effects government expense prior completion tour November 23, 1956. If Smith plans bear this expense and resign should submit resignation to Mission for transmittal ICA/W. Appreciate official report of circumstances involved proposed resignation. If necessary, advance return dependents possible if Smith agrees complete tour. Advise.
25. (a) On April 5,1956, the Beirut Mission Director, by telegram, replied in pertinent part:
Smith understanding upon accepting ETO was continuation of employment without separation evidenced by personnel action following Baghdad assignment. * * * Mission construes FSM III 122.22(e) permits travel government expense * * *.
*257 (b) The provisions of the Foreign Service Manual (Vol. 1, Part III, § 122.22(e)), referred to in said telegram were as follows:
Employees included in the categories listed below are eligible to receive travel authorizations in _ connection with resignations, retirements and separations; if an employee receives a travel authorization in connection with his resignation, retirement or separation, the issuance of the authorization evidences the determination that he is eligible.
‡ ‡ $
e. An employee who resigns after he has served abroad a total of at least 2 years, including at least one year since his latest arrival abroad from home leave at Government expense.
These provisions were in effect in 1952 when plaintiff went to Baghdad, in 1954 when he went to Beirut, and in 1956 when he returned to Washington.
26. ICA in Washington replied by telegram on April 10, 1956, as follows:
Sympathetic consideration given Smith situation but regret not possible grant request. In interests Program, ICA/W urges Smith delay departure in order attend meeting TTAB [American University at Beirut] trustees and complete outstanding work details.
ICA employees governed by MO 560.2 IID, 4, B, (2) re eligibility travel government expense and MO 466.1 re TOK duty.
Smith separation Iraq position and reappointment Lebanon assignment not determining factor this case. However, ICA/W information indicates this action taken enable transportation to Lebanon Smith’s effects/car government expense, that he stipulated this as condition acceptance Lebanon position and agreeable arrangement.
27. (a) On April 20, 1956, plaintiff submitted his resignation to the Lebanon Mission Director and departed the following day for Washington. Since he had no official travel orders authorizing his return, the expenses of transporting himself, his family and his effects, a total of $2,723.85, were borne by plaintiff personally. He and his family returned to Washington on May 11, 1956, and thereafter he became employed by the National Education Association.
*258 (b) After his arrival in Washington, plaintiff was unsuccessful in his efforts to persuade ICA to reimburse him for such expenses. By letter of June 1, 1956, he presented to the agency a claim for reimbursement. This letter stated in pertinent part:
I am writing this letter to present a claim for reimbursement for expenses from Beirut to Washington as follows: per diem, tickets, effects. As you know, from July 31, 1952, until July 31, 1954, I was assigned to Baghdad, Iraq, as the Program Officer of the United States Operations Mission to Iraq. Two days before my departure from Iraq I received a night action telegram from FOA/W requesting me to report to Beirut immediately as the Regional Training Officer of FOA for the Near East and Africa Area, and delay my home leave until November.
My reply to that wire was that I could not at that time take such an assignment, but that I was interested in the work and would discuss it in Washington upon my arrival. The reason for postponing a decision at that time included the fact that I had already sold my car, given up my house, and my household effects had already been shipped from Baghdad to Washington. I had also disposed of a considerable amount of household effects as well as surplus supplies. Further, I did not feel I had enough information about the assignment, nor did I have any understanding of the framework in which I would be working.
When I reached Washington in September 1954,1 discussed this assignment in detail with FOA/W officials. I was also placed in a consultation assignment for the entire month to work on the Iraq Mission’s budget.. In October I accepted the post in Beirut with the provision that I would be permitted to send a car and a restricted amount of household effects, limited to china, silver, linen and rugs. I also pointed out that if such shipments were not possible, I would not be interested in returning to the Near East. My appointment paper for the Regional Training Officer position clearly states that there is no break in service, and I entered on duty as FOA Regional Training Officer for the Near East and Africa on November 23, 1954, with headquarters in Beirut.
In February of 1956, 1 was offered a post in the National Education Association in Washington, D.C., to head up their international programs in education. * * *
*259 On March 8, 1956,1 received 'by letter from ICA/W a counter offer to return to Washington to take charge of ICA/W’s proposed program for third country training. I declined that post because I wished to return to the U.S. educational scene.
* * * * *
* * * on April 3, there was a reply from ICA/W saying that I was ineligible for separation at this time and that if I separated I would be required to bear the travel expenses of my family and effects.
According to the Foreign Service Manual Order Part III 122.22(e), any employee in his second tour of duty, after one year has elapsed, may request separation, transfer or return and be eligible for transportation and return of his effects at U.S. Government expense.
In substance that is what I had understood in discussions with FOA/W officials before I took this assignment in Beirut. On April 5, USO/M Lebanon telegraphed ICA/W to that effect and received a reply citing another section of the Manual Order. The reply from ICA/W also indicates “Smith separation Iraq position and reappointment Lebanon assignment not determining factor this case.”
I have taken the position that reassignment is the determining factor, since the appointment sheet states “without a break in service.”
I resigned as of April 20, 1956, in Beirut, and have borne the expenses of transporting my family and effects. I am now requesting reimbursement for these expenses. * * *
(c) ICA disallowed plaintiff’s claim but advised plaintiff he could file a claim with the General Accounting Office.
28. By letter of September 18,1956, plaintiff filed a claim with the General Accounting Office, which stated in pertinent part:
In presenting my claim to ICA/W * * * I outlined the background of the situation and pointed out that my reassignment to Beirut was, in my understanding, governed by Foreign Service Manual Order Part III 122.22(e) which indicates “An employee who resigns after he has served abroad a total of at least two years, including at least one year since his latest arrival abroad from home leave at Government expense.”
With this condition ICA/W does not agree and has therefore disallowed my claim, * * *.
*260 It should also be pointed out that I could have been returned to Washington at Government expense, if I had elected to accept the post suggested by Mr. Joseph Stokes (copy attached) and had resigned after I had reached Washington. In good faith I did not wish to do this, and since I had given my word to come to the National Education Association, I felt I could not accept Mr. Stokes’ offer.
I was not apprised of any change in the regulations regarding the duration of tours of duty until April of 1956 and, therefore, in light of the intent and the regulations when I joined the Foreign Operations Administration program in 1952,1 feel that I have a just claim for reimbursement. * * *
29. (a) By letter of November 2, 1956, the General Accounting Office disallowed plaintiff’s claim. The letter stated in part as follows:
The record reveals that you accepted an appointment to the post at Beirut, Lebanon, effective October 24,1954, and that you resigned on April 20, 1956, in order to accept a position in private employment.
Under the regulations in effect at the time of your appointment, you were required to remain at your post of duty for a period of two years before being eligible for return transportation at Government expense.
Since you resigned prior to the completion of the required two year tour of duty you were not eligible for return transportation at Government expense. * * *
(b) Plaintiff has not been reimbursed for the expenses in the amount of $2,723.85 incurred in transporting himself, his family, and his effects from Beirut to Washington.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and his petition is therefore dismissed.

 An amendment of this form, dated December 1, 1954, Issued apparently for technical reasons relating to budget allotment designations, also repeated the pbrase “Cont. Serv.”